Would you call the next case please. Case number 330648. In writing Marriage of Tad Courtois a Felon by Tad Eiler versus Julie Courtois a Felon by Barney Olson. Mr. Eiler. So we get it right here. What was your client's last name pronounced? Courtois. May it please the court, opposing counsel, Mr. Olson. My name is Tad Eiler and I represent the appellant in this matter, Tad Courtois. This case is before you or arises out of a dissolution of marriage case from Hancock County in which Mr. Courtois was the original petitioner. As divorce cases go, this case from a factual standpoint is fairly simple in the sense that there was a marital settlement agreement, which I will get to in a moment. But the petitioner, Mr. Courtois, was 49 years old at the time of hearing. Julie was 45 years old. The parties had two children, both who had reached the age of majority. So there was no issue of custody visitation or child support. Both individuals had college education. Both individuals were employed. In fact, Ms. Courtois had two degrees, one in business, one in education, which led to her teaching certificate, which led to her teaching. And then she also had a minor in computer science. Mr. Courtois was employed in sales. The date of the marriage, we have approximately a 25-year marriage. They were married in 1988. The parties had separated in January of 2012. The divorce was filed by my client in February of 2012. And then a subsequent temporary order had been entered in June of 2012. There was later a marital settlement agreement reached and entered into the court on March 26, 2013, the day the parties appeared for a hearing. And the issues that were heard on that date were the issues of whether or not maintenance would be awarded and whether or not attorney fees would be ordered. Those are the two issues that are before the courts and that we have raised in our brief. Specifically, whether or not the trial court in awarding maintenance abused its discretion and or whether or not awarding or ordering Mr. Courtois to pay attorney fees was against the manifest way of the evidence as well and thus an abuse of his discretion. The amounts that were received by the parties, if we look at the marital settlement agreement, which was submitted by myself in the form of a motion to supplement the record, either Mr. Olson or myself or trial counsel, if you have a question as to why that was not a part of the record, I know I can't answer that. And I don't believe Mr. Olson probably can either. I know I made contact with both attorneys to try to figure out what had happened. That's the reason I filed the motion to supplement because that marital settlement agreement was clearly file stamped, made a part of the record, it is in the transcript. And that marital settlement agreement had been reached by the parties. They had reached an agreement regarding the distribution of their assets and it sets forth what the monies that each were to receive. And if we look at that, it shows that Julie essentially received $360,000, whereas Todd received $268,000. That's the difference of approximately $92,000. To be exact, $92,065.80. That, coupled with the additional debt that Mr. Kertoy was ordered to pay, that being the vehicle debt of approximately $23,000, as well as the parties' student loan of $16,000. If we add that debt to the difference in the monies received, we see that Julie received a plus, if you will, of over $130,000, almost $132,000. There was that difference in terms of what the parties received. Now, I certainly will acknowledge and or admit that that amount, in the scheme of things, is not necessarily, and certainly in some cases, not a large amount of money. But in this case, I would suggest that it was a large amount of money. And we need to look no further than the testimony and or the evidence regarding the parties' standard of living in this case. Julie herself may have given the most damning testimony regarding the standard of living that the parties were used to in this case. And that standard of living, using her words, were that they lived frugally and they did not spend a lot of money. There was also testimony that they had no credit card debt. And the standard of living, as your Honors know, is just one of the factors the Court is to consider in determining whether or not a maintenance award is appropriate. And the standard of living, certainly in this case, shows, or there was no evidence that supports, that the parties lived any type of extravagant lifestyle. They did not take repeated or numerous expensive vacations. They did not drive fancy or expensive cars. They lived a very frugal life in rural Pancock County, Illinois. So thus, the amount of $131,000 and almost $132,000, I would suggest, is extremely significant and thus a basis for reasoning for why the Court's awarding of maintenance is inappropriate in this case. Another factor that the trial courts considered in this decision and needs to be addressed is the health of the parties. The appellee, Julie, at trial, and even to a certain extent in her brief before this Court, suggests that she has medical issues or medical conditions that justify the award of maintenance. I would respectfully suggest that the evidence does not support that. The evidence was that she did suffer in the past of breast cancer, but that that breast cancer was and had been in remission. There had been no additional signs, nothing new had come up, she was not in further treatment. The only, and it's not treatment, but follow-up that she had were quarterly visits. So any suggestion that her medical health suffered to the point where maintenance was required is not appropriate or not sufficient with the evidence that was presented to this Court. To the contrary, to use that, I would suggest it's simply conjecture and speculation because no evidence was submitted that supported that her medical needs or conditions somehow warranted this maintenance award or that it impacted or affected her ability to work or sustain her standard of living. In fact, the evidence shows just to the contrary. She worked throughout this. She was employed as a teacher. She had previously worked in the business field. She had two college degrees along with a minor. She always worked during the course of the marriage. This is not a scenario where husband was the primary breadwinner, mom stayed at home, raised the kids, had no formal training, no education, and now dad had a new girlfriend or wanted to be free, so to speak, and mom was left with nothing. Julie had an education. She had a job. She had means to support this frugal lifestyle that she herself acknowledged the parties were used to. Another factor that I believe weighs heavily in our favor, in support of our argument, is Julie's budget that was submitted at trial. The budget and specifically her testimony about budgetary amounts that she had allotted that she was not paying. There were several of those. There were the issue of the attorney fees that she was questioned about. In her budget at trial, she indicated that she had $200 a month as an allotment for attorney fees. She acknowledged in testimony or at the hearing that she was not paying that. In fact, her attorney fees had been paid in full as of March 19th of 2013, and that amount that had been paid in full was $16,346. So the $200 per month that she had in her budget for attorney fees was not necessary because she was not making that payment. The monthly mortgage that she had... But she testified that she had paid the ones that had already accrued, but that she knew others were going to accrue. I mean, the ones that had accrued from, like, during the actual trial itself. And I think, what was it, $2,700 the court found she owed at the time of his judgment and the order about the contribution? You are correct. The amount, the $16,000 amount that I stated earlier, was an amount that had previously accrued, that she had previously paid, and there was testimony that there were additional fees that had been incurred as a result of their hearing that day in preparation of that hearing. And then you said $2,700. I was thinking it was $2,500. At least I know that Todd was ordered to pay $2,500 of those attorney fees. So you are correct. However, she acknowledged and testified at trial that she was not making that payment at that time. In terms of the monthly mortgage that she had set forth in her budget of $432.45, she also acknowledged that she was not making that payment. That she had not made that payment for quite some time in light of the temporary order that had been in place that required Todd to make the mortgage payment. So there were additional monies that she had set forth in her budget in preparation for trial that she was not paying out. Additionally, there were monthly medical bills that she had set forth in her budget of $500. There was no evidence, no testimony regarding any ongoing treatment or bills. The only money that, actually I believe in her budget she had approximately $575 allotted. However, the only monthly amount that was supported by the evidence was the amount of the insurance. So that's why I use the figure of $500. Because when you take out the monthly amount for the insurance that's in the record, it comes down to approximately $500 that she is not paying that she had in her budget and was suggesting that she needed. The evidence, however, did not support, again, as I stated earlier, that she had any ongoing treatment with the breast cancer or any other issues. There was never even any testimony about medications or the cost of medications and how expensive those were and how she couldn't meet those costs. I think those needs or bills, that was not there. The evidence was not there in support of that. There was an additional amount in her budget of $182 to Barnes-Jewish Hospital. That, however, the testimony shows, was not going to need to be paid by her because the monies from the HSA account, the account that they had set aside for Todd's employment, was going to be used to pay that bill. So that was no longer a bill that she had or would need to pay. Additionally, under the personal expense category for her budget, she had increased that amount prior to or in preparation for court. In a financial affidavit previously, she had set forth one figure, but as she got closer to trial, she increased that figure by over $400. And the evidence, I believe, when she was questioned, does not warrant or show or support what that increase was for, and she gave no explanation or validation for that. So if you total those numbers, we have an amount of over $1,700 that she had set forth in her budget that she claimed when she prepared the budget, she was paying out, but admitted at trial that she was not paying out. So she has an inflated budget of $1,700. If you take that off the top, so to speak, clearly that supports the notion that $800 a month of monthly bills than what she was suggesting. With the exception of the money that's going to go from the HSA account to Jewish Hospital, I mean, the income expense, I mean, it's contemplated that when the divorce is final, the temporary order will be extinguished, and that the mortgage is going, I mean, she's going to have to pay rent or mortgage somewhere, correct? I mean, are you saying that she's never going to have to pay these, or that when she gets married and she's testified, she knew he was paying them, but that it wasn't reasonable for her to expect that she'd have to begin paying those? If I understand your question correctly, I would agree with you that you could make the argument that at some point when she vacated or was removed from the marital home, that she might have to incur a monthly amount to pay for housing. I certainly think that's a fair argument. However, no evidence or testimony was presented to support or show what that figure would have been. So I would suggest if we just pick a number out of the air, either number, whether we go high or whether we go high or low, is conjecture. It is speculation. On top of that, as long as... We should say zero? I don't know that it's realistic for me to stand here and say that you should say zero. However, certainly it would be her burden, I would suggest, to show what the amount was that she should have to incur. Whether that was through the form of testimony about what the average rents are in the area in Carthage, if she had looked into it, whether she brought in a realtor or someone else to say what the houses are worth and what an average monthly payment might be based upon her financials, that was not done. I'm not going to stand here and try to suggest that you should just use zero. However, evidence was not presented and I would suggest, again, no matter what number you pick, it would be based upon conjecture, not anything that is set forth in the evidence. The only evidence that you would have would be the amount of the monthly payment on this house, which Mr. Courtois was paying and was ordered to pay until the house was sold. And that amount was? And that amount was how much? That amount was, that would have been the amount set forth in the temporary order, the $500 as well as the $300. Which is $800. I'm sorry. Which is $800. The one amount was the normal mortgage, the other was towards the home equity loan, which ironically was taken out to help support and pay for her schooling when she went back to get her teacher's degree. Let me ask, as far as the number on the housing, I mean, of course you all didn't put any on the evidence either of what her housing costs would be, and the trial judges in these cases, it's not like a zero-sum game where they've got to make both sides of the county thing line up. In other words, they've got some, you know, it doesn't have to be equal here and there, because it would be almost in most cases impossible to do. So these trial judges have some wiggle room in determining these things, right? It's not like a business, a lawsuit over business accounting where you've got to account for every dime that's going to be spent. When the parties do not present such evidence, it certainly puts a trial judge I think in a precarious situation because they either take the evidence that was presented to them, and if in this case you say no evidence was presented, they make a ruling that arguably sets itself up or opens itself up to objection later on. But even if we take the amount that she had in her budget, the $432, even if you give that to her, so to speak, or add that to her budget or leave it be, she still has over $1,300 in her budget. At the time of the hearing, I believe it was approximately $35,000. What's his income? And in essence, what this maintenance award does is it gives her $10,000. So with that income discrepancy and a 25-year marriage, we've got to say to reverse this that no reasonable person could agree with that based on the law and the length of the marriage. So that would bring him down. Of course, he doesn't pay tax on that $10,000 that goes over there, so it brings him down to $70,000 and her up to $45,000. Even though they both had jobs, how do we sit here and say that no reasonable person each one of us might have come up with a different number, but how do we say that no reasonable person could agree with what the judge said? Because I'm guessing the three of us sitting here, each one of us might have done it differently than the other. Well, you have at least some evidence in the record that shows or supports that the amounts that you just asked about and I gave you, the $85,000 figure, was higher than what Todd had earned in the past. And the evidence at trial was in fact that his sales, because he was employed in sales, his base salary was $20,000 plus a formula that compiled the commissions. His sales were down .7 or .9, almost 19% at the time of the trial for that year. So that is the evidence certainly that we have in terms of what his earnings were doing at that time. Now, both sides can make the argument, they may go up substantially later on, they may go down, but again that would be conjecture. So you at least have the evidence before you that he was not scheduled to earn as much money that year as he had in the past. In addition, I believe to answer, I guess more specifically, your initial question is, this is a two-fold step. Not only are you looking at whether or not he has the income to be able to pay, there is also whether or not she has a need. And that is certainly the reason I harped on or addressed, if you will, the budget because she has to first be able to say, I don't have enough money to meet my bills, to make ends meet. And when she inflates her budget, even if we add back in the mortgage payment, by some $1,300 that is harder for her to be able to show, I need that much money or this much money. And so, I mean, is it your argument that the law is that for without maintenance they couldn't meet their bills? I believe she has to show she has a deficiency and then Mr. Kertoy has the ability to pay. Go ahead. No, I'm sorry. No, finish your answer. I was just going to say certainly that is going to change in the very near future. And just to follow up on that is, maintenance is always a matter of time. If there is a change in circumstances, she can come in or your client come in and say, hey, look, here is what is happening. I lost my job or thing and now my income is whatever and I can't pay this anymore. I mean, these orders are never carved in granite, right? I would agree with that, yeah. Under the new law that is effective January 1st of next year, do you know what this amount would be? I was afraid somebody was going to ask that because I have not run those numbers and I have not figured out. More than $100 a month. I honestly don't know. I have not looked at that. It is a 25 year marriage. I know the length of the marriage, certainly. There is all these percentages and caps at 40% of their total or combined income. But it is a 25 year marriage so that is a higher percentage and there is a deduction involved and so forth. In a sense, since that law was passed, it is sort of like a new policy that is coming into effect January 1st, right? Yes, that is how I understand it. The other issue that I would like to raise, I am sorry. And here is a big discrepancy in the incomes between the husband and wife. The evidence was that he made at the time of the hearing approximately $85,000 and she was making $35,000. I cannot disagree with that. Those are the facts. Thank you. The other issue that I think I would be remiss in not addressing is an issue raised by the opposing counsel in the brief where it suggested that I reference the memorandum, excuse me, the marital settlement agreement and suggested that it said something that it did not in terms of the retirement. I would agree that there is a sentence in there that probably was poorly written by myself and it does maybe suggest or allude to that information was not in that marital settlement agreement. It clearly was not in terms of Julie's retirement amount, but I stand by what I have set forth in my reply brief that it clearly is before the court. It was in evidence three different places. It was in a financial affidavit. It was in an exhibit presented by both parties at trial and even Julie's. So in the event that my poorly written sentence in the one section led to that misunderstanding, I apologize to all involved. But certainly that information is before the court. In the event that I have forgotten anything in the brief, I certainly ask the court to allow us to adopt and incorporate that here. And if there's any other questions, I certainly would be happy to take those. Thank you, sir. Mr. Olson. Good afternoon. My name is Barney Olson. I'm an attorney in Galesburg, Illinois, and I represent Julie Courtois. The clerk was nice enough to ask both counsel and myself how to pronounce the last name. And I noticed that you had that question also. It took me a while because my French was never very good. But I would point out one thing, and then I think some of the questions that each of you have asked are going to be addressed by my presentation. If they aren't, please interject at the appropriate time. The one thing that should be noted is in the record, and I believe Justice O'Brien asked the question dealing with the financial statement and the estimates or things that would maybe not be always an expense of Mrs. Courtois. In the Ninth Judicial Circuit, we have, and it's noted on our financial affidavit, and that is Exhibit C in the record, that any time something has an asterisk on it, and you have to sometimes look closely because the asterisks are rather small on the printers, it's an estimated figure and it was something that she was anticipating might be necessary after the fact. The only other thing I would mention that wasn't in my prepared remarks is what happened to the marital settlement and being not included in the record. I was not trial counsel, nor was Mr. Iowa. We met for the first time today. My only theory on that can be just a simple mistake that the Hancock County Clerk's Office somehow lost it or didn't have it. There's no doubt that it was a part of the trial record, so that is no longer an issue. Does the record show it was admitted into evidence? I believe it does, yes. Sometime in the future it might be corrected. Well, I think it was corrected to get it up here so you folks can look at it. As I mentioned, neither of us were trial court counsel, so we each have a little bit of back learning to do to get into this case. The thing that is really the crux of this is that the trial court has an extremely wide latitude in determining what is reasonable maintenance and it is not limited to just the factors that are contained within the statute. Counsel mentioned that the issue of Julie's Social Security income into the future. That's what Judge Bantle, I think, considered in making a maintenance award because her Social Security income that was shown on the financial affidavit is a prospective thing and the dollar amount that's involved in that is a prospective, just as she's not eligible for Medicare until a certain age in the future. That's where I think a lot of that, in rendering his opinion, found that she would be getting those and that would help her from that point forward, but it would surely not help her from now, at the time of the decision, until then. And these elements are something that he obviously considered because the financial affidavit of both parties was considered. Justice Conner notes the distinct differences of income, 85 and 35, that's a crucial factor. One of the things that I did in looking at Judge Bantle's decision was to look at the cases cited by Mr. Eiler in his brief and I think that those cases, in the substance of them, support what Judge Bantle did and with a little bit of indulgence I'll comment on those just briefly. The Stam case, I think, actually supports what Judge Bantle did. He considered, one, the Courtois marriage was 24 plus years, almost 25, significantly longer than the Stam case suggested. Julie might have a reoccurrence of her breast cancer. Obviously, we can't predict what happens with that. That is a big unknown in any woman and now I understand breast cancer is becoming an element even in men's health. I didn't know that until just recently. Can I ask the same question I asked Mr. Eiler and that is, if she has a recurrence of breast cancer and her expenses go up, she can always come back and petition the court to increase maintenance, can't she? She could do that and I think Justice Carter's comments there about the new law coming into effect, I don't know what that number is. When I saw that that was going to happen, I tried to compute it and I couldn't. It's lost on me at this point as to how it's going to occur. But yes, you're absolutely correct. She could come back. Mr. Courtois loses his job or if Julie finds out that all of a sudden the fact that he was going down 18% in one year, all of a sudden right before trial, his commissions are up much more, she could come back and ask for more too. But I guess my point is to award maintenance based on something that might or might not happen in the future. It doesn't make a lot of sense to me when you've always got the right, if that does happen, then you come in and seek an increase based on that. I think Judge Vancell's opinion kind of addressed that. He addressed the fact that she was going to have to carry her own health insurance at this point. He was trying to cover that so that she wasn't out of pocket. There's a quote that I have later in the other elements that I was going to count that the thyroid condition might reoccur and that she must maintain her own health insurance. I just covered that. She's got 20 years left before that comes into play. So I think that's where Judge Vancell made his decision. The disparity of incomes, we've talked about that. I don't think he abused his discretion as the court in Stan had considered those elements. The 504 elements were properly considered by him, as far as I can tell, in that his opinion letter reflected the things that he'd considered. There's a quote in my brief that I'm sure you've all read. It says, A trial court's decision regarding the amount of maintenance award will not be overturned unless no reasonable person, and Justice Schmidt, you referred to this, I believe, would take a view adopted by the court. I don't think that anybody can argue with the rationales that Judge Vancell put forth here. You all appear to be, from your questions that you ask of counsel and that you're asking of me, to be reasonable persons. I don't think you can overturn Judge Vancell's decision based on what counsel has argued. The Mastin's case factors, it's obviously, when you look at Mastin's, were also considered by Judge Vancell. The circumstances. Counsel seemed to spend some time with her multiple education degrees and whatever. Yes, she does have that, but that education degrees will never get to the level, my daughter's an educator, so I know this, never get to the level of a man making $85,000 a year and potentially more with his commissions. It just doesn't happen. So Hancock County, as I think you all know, is not exactly the most affluent area in the country for a lady of Julie's age to find a high-paying job. And I don't think that that's anything that we could anticipate into the future. The Menier, I think I'm saying that right, or Menier Court, had very similar factors to this case and it was affirmed by both the appellate and the Supreme Court levels. That might be further affirmation distinctly that Judge Vancell didn't abuse his decision. I'd also note that when the disparity of incomes was considered in Menier, they're very similar to those incomes that existed in the Courtory case. Let me, before you run out of time, I would thank you if you would address the payment of attorney fees. Yes, sir, I will. Justice Smith, thank you very much, you just made me skip five pages of talking. No, no, no, I'll address attorney's fees, sir. This is the sound discretion application again. And in this case, I think it's clear what happened. Julie's fees, up until right before trial, had basically been paid from whatever source. Then what Judge Vancell did was he took the preparation for trial on the attorney's fees and the maintenance issue and the actual trial time, and that's where the $2,500 figure came from, because that's what was anticipated that it would cost to go to trial. There's some notes in the record that the trial time took actually a little bit less than that, and so maybe the $2,500 wasn't warranted. But you will note from the record in front of you that when he rendered his opinion, it took well over a month in a motion for the entry of a judgment by Julie's lawyers before they could get a judgment entered. There was no agreement between counsel for Mr. Courtois and counsel for Mrs. Courtois that could even get a judgment entered, so they had to come back for another hearing for the entry of that. The $2,500 is clearly a very reasonable number for what had to go on to try this case. Well, and certainly that may well be true, but if Julie is able to pay those, in other words, if she has the wherewithal to pay those, isn't the rule generally that she pays them? Yes. If she's able to? If she's able to, and I think that what Judge Vancell did when he found that she wasn't. The cases are legendary that says a person to get an award of attorney's fees, and let me find that exact quote for you, please, does not have to be destitute and does not have to invade her property settlement to eat her property settlement by the payment of attorney's fees. In other words, isn't that the whole series of leveling the playing field? Yes, sir. The statutes that were passed subsequent to the 1977 act. Yes, sir. And the leveling of the playing field when you consider an 85 and 35 was done by Judge Vancell and the attorney's fees. But, you know, I mean, she doesn't have to sell a farm to pay the attorney's fees, you know, the other awards. I'm just wondering, you said you're looking at the 85, 35 stuff, or are you counting that twice, you know, once in maintenance and once in attorney's fees? I think it applies both places, Justice Smith, I really do. And I think that in this particular case, when you look at the overall scope of things, $2,500 is not a lot of money for Mr. Kertoy at his income level to contribute to the final amount of fees of his wife's case. Thank you. Thank you. I noted in my reply for my – yes, my appellee's brief that several of the cases just – they really stood for factors that were in our case but seemed to be cited for counsel in opposition to what happened in our case. I think that Judge Vancell, in answer to your question, Justice Smith, did look at the ability to balance the ability of Julie to pay as opposed to the maintenance factor as well as the attorney's fees. We're trying to level the standard of living which they had. Counsel points out that was a minimalistic type existence, but that shouldn't have to continue if Julie now has to do everything herself. She shouldn't have to live on her 35 when they were used to living on 85 and 35. Some places that balancing act in there. Justice Carter mentioned the 501C1 level of the playing field. I think that you have a choice, obviously. That's why you're here. But I don't think that you have the elements in this appeal to overturn Judge Vancell's decision. I think it was learned. He evidenced that by his opinion, and I think he should be affirmed. Any additional questions? Thank you, Mr. Olson. Thank you. Mr. Eilers, some rebuttal. Mr. Olson, counsel repeatedly talked about Judge Vancell's decision and how he believed it was well-reasoned and supported the decision. But let me give you an example of the judge's decision that I do not believe respectfully is well-reasoned based upon the facts. In his written letter, he talks about the standard of living or post-standard of living that Todd has enjoyed. And in part, he references these two trips to a fancy restaurant. And the evidence supports what the evidence said about those two trips was that Mr. Cotoy went two times to this restaurant. One was a $92, I believe, maybe $94 bill, and one was approximately a $192 bill. And the second trip was when he took his parents for an anniversary, I want to say 40th or 50th wedding anniversary. That, respectfully, is not some type of standard of living that warrants giving Julie this, that, and the other. And in that same paragraph, he also references that since the separation, that she was no longer able to have a home phone, cable television, internet, yoga, manicure, pedicures, cutter clothing expense, gifts, and other expenses that she had had during the marriage. He does say that, and that's the risk of me making the argument that I opened the door for one of you to say that. However, if we look at the transcript and you look at the evidence that was presented with that, I respectfully suggest that the evidence does not completely support that. Certainly, Julie testified that, in a general sense, that she had to reduce this, that, or the other. But in terms of specifics, if you look at that record and look at that transcript, it is lacking to say the least. I can stand here and say whatever I want in a general sense, but if I can't back it up with specifics, I think that certainly lacks some credibility or at least lends suspicion to a certain extent. Additionally, Mr. Olson talked about the difference in the two incomes and how Julie, as an educator, will never be able to make the $85,000 that Mr. Cotoy was making at the time of the hearing. I respectfully, it's not part of the record, be it in either that statement or what I'm about to say, but I disagree with that. We all know teachers that have started and moved up to administrators that are making well more than $85,000. And you know what? If she does, you get a file of motion and come in and reduce the maintenance, right? That is correct. So unless there's any other questions, I would just ask and, again, adopt and incorporate our brief and stand on that. Thank you. Thank you, Mr. Eiler. Thank you both here for your arguments this afternoon. This matter will be taken under advisement and a written disposition will be issued. Right now we'll be in a brief recess for a panel discussion. We'll be back.